**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**BOBBY KING AND JAMES FORD,**

        **Plaintiffs,**                                    **02-CV-349Sr**

**v.**

**FLOYD BENNETT, JOHN HAYES,**
**JOHN LACONTE AND GLENN GOORD,**

        **Defendants.**
_____

## DECISION AND ORDER

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this case, including entry of final judgment.  Dkt. #23.

Currently before the Court is defendants' motion for summary judgment dismissing plaintiffs' complaint of denial of the right to free exercise of religion by virtue of DOCS' policy of holding joint Friday prayer services for both Shi'a and Sunni Muslims.  Dkt. #33.  For the following reasons, defendants' motion is granted.

## BACKGROUND

In *Cancel v. Goord*, a Shi'a Muslim incarcerated at the Fishkill Correctional Facility filed a grievance "requesting that Shi'a Muslims be allowed to have religious study meetings, classes or study group specific to their religious beliefs and

that they be allowed access to outside Shi'a clergy persons." 181 Misc.2d 363, 364 (Sup. Ct. Dutchess County 1999), *aff'd as modified*, 278 A.D.2d 321 (2d Dep't 2000), *leave to appeal denied*, 96 N.Y.2d 707 (2001).  The Department of Correctional Services ("DOCS"), denied the grievance, prompting the inmate to commence an article 78 proceeding challenging DOCS' determination as arbitrary and capricious. *Id.*  The trial court concluded that DOCS' determination that the spiritual needs of the inmates of the Shi'a Muslim faith could be met in religious services led by chaplains of the Sunni Muslim faith was arbitrary and capricious. *Id.* at 365. Accordingly, the trial court granted the petition and annulled DOCS' resolution of the grievance. *Id.* at 365-66. The trial court also ordered that DOCS permit Shi'a inmates "to have contact with a volunteer Shi'a scholar" or, if no such volunteer was available, to permit Shi'a inmates "to participate in a religious education class or study group up to once per week with an approved inmate acting as facilitator and with security staff present . . . ." *Id.* at 366.

The Appellate Division affirmed the trial court's order insofar as it granted the petition and annulled DOCS' resolution of the grievance, but vacated that portion of the trial court's decision "which directed the manner in which [DOCS] was to permit the petitioner and his fellow adherents of the Shi'a sect of Islam to practice their faith, and remit[ted] the matter to . . . DOCS to conduct administrative proceedings, with Shi'a participation, to determine the manner in which to best afford Shi'a inmates spearate religious services, under appropriate Shi'a religious leadership, in a time and place that comport with legitimate penological concerns." 278 A.D.2d at 323.

In accordance with that decision, DOCS implemented an official policy entitled "Protocol for Shi'ite Muslim Programs and Practices" ("Protocol"). Dkt. #36, ¶ 5. The Protocol requires DOCS to: (1) refrain from disparaging the doctrines of any religious faith; (2) endeavor to consult with ecclesiastical authorities on Shi'ite Islam in the community at large to obtain advice and guidance regarding accommodation of the religious needs of Shi'ite inmates; (3) afford Shi'ite inmates the right to attend Shi'ite religious education and study classes; (4) afford Shi'ite inmates full and equal opportunity to participate in, without discrimination, the weekly Friday Jumah[1] services and ensure that the Muslim Council has at least one Shi'ite member; and (5) revise it's religious observance calendar to include observances unique to Shi'ite Muslims. Dkt. #36, ¶ 5.

Following implementation of the Protocol, *Cancel* moved for civil contempt, arguing that DOCS "disobeyed the express mandate of the Court to afford Shi'a inmates separate religious services under appropriate Shi'a leadership." Dkt. #36, Exh. D, p.4. Despite the language used by the Appellate Division, the Hon. Mark C. Dillon, J.S.C., determined that

> The Order of the Appellate Division remitting this matter to
>  . . . DOCS does not mandate separate religious services for
> the Shi'a inmates. If it had, there would have been no need
> of a remittal. The Order only mandates that . . . DOCS
> determine the manner in which the Shi'a inmates can
> practice their faith, apart [from] Sunni prisoners.

Dkt. #36, Exh. D, p.5.

---

[1] Jumah is a weekly congregational service commanded by the Quran which must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344 (1987).

On January 24, 2002, plaintiffs filed grievances at the Elmira Correctional Facility ("Elmira"), claiming that the Protocol did not conform to *Cancel v. Goord* and violated their right to attend separate Shi'a prayer services.  Dkt. #5, Exh. 2.  DOCS denied the grievances, stating:

> Jumah services are held on Friday afternoon with Shi'ite and Sunni Muslims in the mosque.  Worship classes for Sunni and Shi'ite are held separately each week.  Therefore, the facility is in accordance with the state directive and the *Cancel v. Goord* decision.

Dkt. #5, Exh. 2.

Plaintiffs commenced this action by filing a complaint in the Northern District of New York on April 12, 2002, which was transferred to this district for proper venue.  Dkt. #5.  Although plaintiffs' complaint acknowledges that the Islamic Chaplin at Elmira had authorized a Shi'a study group one night per week to enable Shi'ite Muslim inmates to learn and study the Shi'ite Muslim Sect of Islam, plaintiffs allege that Shi'ite inmates have not been afforded a meaningful or reasonable opportunity to freely participate and practice the Shi'a faith in a separate religious service as set forth in *Cancel v. Goord* and as required by the First Amendment to the United States Constitution.  Dkt. #5, ¶ 4.  Plaintiffs demand Jumah services separate and apart from Sunni Muslims and seek monetary damages to compensate for their mental anguish and to punish DOCS' refusal to comply with *Cancel v. Goord*.  Dkt. #5, ¶ 11 & p.6.

In support of their motion for summary judgment, defendants submit the affidavit of Richard Cerio, Deputy Superintendent for Programs at Elmira.  Dkt. #36.

Deputy Superintendent Cerio declares that Elmira

> is in accordance with the Protocol, as Elmira has one general Muslim service on Fridays, Shi'a Muslims participate in these services, and at least one Shi'a is on the Muslim Majlis.  When Elmira occasionally has inmate facilitators assist in the prayer service, the responsibility is shared by both Sunni and Shi'a Muslims.  Shi'a inmates also have the right to attend Shi'a Muslim religious education and study classes apart from Sunni Muslims (as Elmira has a weekly study class that is held on Thursdays from approximately 6:30 to 9:00 pm).  Shi'a Muslim inmates can also participate in Arabic language classes and Islamic studies classes, which are conducted by an Imam.  Finally, Elmira's Religious Observance Calendar for 2003 is being revised to include the Day of Ghadi (March 3), which is a day of prayer and reflection for Shi'a Muslims, and to include Ashura (March 24), a further day of prayer and reflection for Shi'a Muslims.

Dkt. #36, ¶ 8.

Defendants also rely upon the October 3, 2001 affidavit of John LoConte, Director of Ministerial and Family Services for DOCS, which was submitted to the district court with respect to a motion for preliminary injunction by a Shi'a inmate at the Fishkill Correctional Facility seeking religious services separate from Shi'ite inmates. *Pugh v. Goord*, 184 F. Supp.2d 326 (S.D.N.Y. 2002), *vacated*, 345 F.3d 121 (2d Cir. 2003).  Director LoConte affirms that although "plaintiffs may be viewed as simply asking that DOCS accommodate their request for a separate prayer area and religious services for a single religious sub-group – Shi'ite Muslims – in reality, establishing a separate organization and program for such inmates would increase pressure on DOCS to make such distinctions for other groups, or subgroups, now and in the future." Dkt. #37, ¶ 27.  For example, Director LoConte notes that there are over 200 protestant denominations encompassed within the Protestant program and three major

denominations within the Jewish program.  Dkt. #37, ¶ 42.  Director LoConte also avers that "[s]eparate programs would raise security concerns and are fiscally prohibitive because each such program would have to be overseen by prison staff."  Dkt. #37, ¶ 28.  In addition, DOCS lacks sufficient space for separate worship areas.  Dkt. #37, ¶ 32.  Furthermore, Director LoConte affirms that

> dividing DOCS' Islamic program into separate programs for each sect represented in the prison system would encourage rivalries among the different sects by promoting power struggles and competition for new members or converts.  By way of example, in the late 1970's and into the 1980's there had been two major Islamic programs in the state's prison system: a generic Islamic Program and the American Muslim Mission.  The inmates in each of the two programs competed for new members and converts from the other.  On many occasions this competition turned violent.  Recognizing the divisiveness of having the two programs, the religious leadership agreed to a unification and a singular Islamic program, since which the various Muslim sects have coexisted peacefully within DOCS' Islamic program.

Dkt. #37, ¶ 29.   As a result, DOCS has structured the current Muslim program "to accommodate beliefs and practices common to all Muslims."  Dkt. #37, ¶ 17.

In opposition to the motion for summary judgment, plaintiff King[2] argues that the Protocol does not provide for separate religious services under appropriate Shi'a leadership as required by *Cancel v. Goord* and the free exercise clause of the First Amendment.  Dkt. #40.  To support the sincerity of his belief in the necessity of separate Jumah, plaintiff King avers that "the Practical Laws of Islam" by Imam Khomenini, requires that "one who conducts congregational prayer must," *inter alia*, be

---

[2] Plaintiff Ford has not participated in this action since his release to parole on June 10, 2002.

a believer in "the twelve Imam Shia."  Dkt. #60, p.2.  Plaintiff King also avers that

> Sunni Muslim adherents perform certain religious functions that invalidate prayer for Shi'a adherents, i.e., the folding of the hands in prayer on the chest, stomach, turning of the head in prayer and the recitation of the words AMIN after the recitation of the Fatiah chapter of the Quran, all of which invalidate prayers for any Shi'a adherents . . . which ultimately means that it's an invalidation of the central tenant [sic] of worship . . . .

Dkt. #60, pp.2-3.

## **DISCUSSION AND ANALYSIS**

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), *citing Pell v. Procunier*, 417 U.S. 817, 822 (1974).  However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials chaged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.  *Ford*, 352 F.3d at 588.  Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests.  *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006), *citing O'Lone*, 482 U.S. at 349 *and Turner v. Safley*, 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs. *Salahuddin*, 467 F.3d at 274-75. In assessing the sincerity of an inmate's religious belief, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir. 2004), *quoting Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford,* 352 F.3d at 593. Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590. A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996).

Assuming, without deciding, the sincerity of plaintiff King's belief that engaging in Jumah with Sunni Muslims invalidates his prayers and substantially burdens the exercise of his religious faith, DOCS' refusal to afford Shi'a separate Jumah will still be permissible if it is reasonably related to some legitimate penological interests. "Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates and prison

resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests."  *Salahuddin*, 467 F.3d at 274, *citing Turner*, 482 U.S. at 90-91; *Ford*, 352 F.3d at 595.   Once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these penological concerns are irrational.  *Ford*, 352 F.3d at 595.

In the instant case, DOCS has articulated a rational basis for their refusal to afford Shi'a inmates an opportunity to attend Jumah separate from Sunni inmates. Director LoConte expresses concern that permitting separate Jumah for Sunni and Shi'a inmates would pressure DOCS to afford separate services for numerous subgroups within the Protestant and Jewish faiths which would increase fiscal and administrative burdens and encourage rivalries among different groups by promoting power struggles and competition for new members and converts.  Dkt. #37, ¶ ¶ 29, 42.  As justification for his security concerns, Director LoConte recounts that DOCS previously recognized two major Islamic programs but unified them because of violent competition between the groups.  Dkt. #37, ¶ 17.  Director LoConte also affirms that DOCS lacks sufficient resources, staff and space to accommodate separate Jumah services, a consideration under both the first and third factors.  Dkt. #37, ¶ ¶ 28, 32.

With respect to the second and fourth considerations, Director LoConte affirms that DOCS has structured the general Muslim program "to accommodate beliefs

and practices common to all Muslims" and has endeavored to equalize participation by Sunni and Shi'a with respect to Jumah by sharing responsibility between Shi'a and Sunni inmate facilitators when such facilitators are utilized and by including at least one Shi'ite member on the Muslim Council.  Dkt. #36, ¶ ¶ 8 & 17.  In addition, DOCS has afforded Shi'a inmates, including plaintiff King, the opportunity to attend weekly Shi'a religious education and study classes and has added holy days unique to Shi'a Muslims to Elmira's Religious Observance Calendar.  Dkt. #36, ¶ 8.

As a result, it is the decision of this Court that DOCS' Protocol, as currently implemented at Elmira, strikes a reasonable balance between the accommodation of plaintiff King's religious beliefs and DOCS' legitimate penological interests and does not, therefore, violate plaintiff King's constitutional right to free exercise of religion.  *See, e.g., Orafan v. Goord,* 411 F. Supp.2d 153 (N.D.N.Y. 2006 (DOCS did not deny Shi'a inmates statutory rights under Religious Land Use and Institutionalized Person Act or First Amendment free exercise rights by refusing to provide Jumah service separate from Sunni inmates); *Muhammad v. City of N.Y. Dep't of Corrs,* 904 F. Supp. 161, 197 (S.D.N.Y. 1995) (First Amendment did not require accommodation of Nation of Islam inmate's request for separate services), *appeal dismissed*, 126 F.3d 119 (1997); *Matiyan v. Commissioner Dep't of Corrs*., 726 F. Supp. 42, 44 (W.D.N.Y. 1989) (DOCS' refusal to honor Sunni inmate's request for Jumah separate from Shi'a inmates did not offend the Free Exercise Clause of the First Amendment).

**CONCLUSION**

Based on the foregoing, defendants' motion (Dkt. #33), for summary judgment dismissing plaintiff's complaint is **GRANTED**.

The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied.  *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

DATED:   Buffalo, New York
         March 30, 2007

                                      S/ H. Kenneth Schroeder, Jr.
                                      **H. KENNETH SCHROEDER, JR.**
                                      **United States Magistrate Judge**